1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ODILON ALBARRAN,** | Civil No.      11-cv-0019-BTM(BGS) |
| **Petitioner,** | |
| | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE PETITION FOR WRIT OF HABEAS CORPUS** |
| **vs.** | |
| **L. S. McEWAN, Warden,** | |
| **Respondent.** | |

State prisoner Odilon Albarran ("Albarran"), proceeding *pro se* and *in forma pauperis*, seeks 28 U.S.C. § 2254 habeas relief from his December 8, 2006 conviction and sentence for a 1991 murder in San Diego County Superior Court Case No. SCD187650.  A jury found him guilty of first degree murder with personal use of a deadly weapon and found true a special circumstance allegation he committed the murder in the course of a robbery.  (Lodg. 1, CT 0262-0263; Lodg. 14, RT Vol. 4, 1353-1355.)  As summarized by the Court of Appeal in its May 4, 2010 denial of his habeas petition:

> Odilon Albarran came to the attention of law enforcement cold case investigators in 2004 when DNA from a ski mask used in a 1991 robbery-murder matched DNA Albarran had provided to a data bank. In 2006 a jury convicted Albarran of first degree murder and found he personally used a deadly weapon.  The court sentenced him to life without the possibility of parole plus one year.  We affirmed the judgment on January 13, 2009.

(Lodg. 11, p. 1.)

Albarran's federal Petition alleges fifteen grounds for relief.  Respondent filed an Answer, conceding the Petition was timely filed and the claims are exhausted, but opposing any habeas relief.

(Dkt No. 13.)  Albarran filed a Traverse.  (Dkt No. 23.)  The Court has reviewed the pertinent portions

of the trial transcript and case record in consideration of controlling legal authority and, for the reasons

discussed below, it is recommended the Petition be **DENIED**.

## I.      BACKGROUND

In its January 13, 2009 decision affirming the judgment, the Court of Appeal summarized the

prosecution's case before rejecting all twelve claims Albarran had raised.  (Lodgs. 2, 5.)

> In 1991 Antonio Ayala (Tony) was running a drug business out
> of an apartment he shared with his wife Carolina Chavez[1] and his
> brother Miguel Ayala (Miguel).  Tony sold cocaine, rock cocaine and
> marijuana.  Until the middle of 1991, Carolina's then-13-year-old
> daughter Veronica Chavez (Veronica) and another adult male, Oscar
> Aguirre, also lived in the apartment.  Veronica and Aguirre were forced
> to leave the apartment after they became romantically involved.  When
> they left the Ayala apartment, Veronica and Aguirre moved into an
> apartment with appellant [Albarran].

> After he left the Ayala apartment, Aguirre continued to have
> contact with Tony, and in the middle of September he bought a gun
> from Tony.  While Tony was selling the gun to Aguirre, Tony was also
> counting his drug money.  Caroline did not like Aguirre and told Tony
> that Aguirre could not be trusted.

> About 10 p.m. on September 16, 1991, Aguirre's cousin stopped
> at the Ayala apartment and asked Miguel if he could obtain drugs on
> credit.  Miguel, who usually slept by the front door so he could provide
> service to Tony's clientele, told the cousin he would "front" the cousin
> the drugs.  Rather than taking the drugs, the cousin said he would come
> back for them and left.  Thirty minutes later, someone knocked on the
> door.  When Miguel opened it, he was confronted by two masked men,
> one of whom had a gun.  As the two men forced their way into the
> apartment, one of the men told Miguel, "This is a holdup."

> The shorter of the two robbers began trying to choke Miguel
> with a shoe lace.  As this was occurring, Tony came out of the bedroom
> and began fighting with the other taller robber.  Miguel was able to flip
> the shorter robber over his shoulder.  The robber hit Miguel with his
> gun and then went into the kitchen, where he grabbed a knife.  The
> shorter robber then began slashing Miguel, who was able to take the
> ski-mask off the shorter robber.

> Eventually, because of the knife wounds he suffered, Miguel
> was no longer able to fight.  The robber without the mask then turned
> his attention to Tony.  He knifed Tony 14 times.

> Carolina came into the living room and saw the unmasked
> shorter robber with something in his hand, hitting Tony; according to

---

[1]  Carolina Chavez testified she was Tony Ayala's common law wife. (Lodg. 14, RT Vol. 8, 690:28-
691:1.) The record also refers to her as Tony's "girlfriend." (*See, e.g.*, Lodg. 14, RT Vol. 4, p. 243.)

Carolina, at that point only the unmasked robber was fighting with Tony, who was bleeding profusely.  The robbers fled the apartment, and Miguel saw them get into a white TransAm or sports car.  According to Miguel, only the shorter robber knifed Tony, and, according to Carolina, only the shorter robber was fighting with Tony at the time she came into the room.

Carolina called police from a neighbor's apartment; while waiting for police and paramedics to arrive, Carolina instructed Miguel to gather up evidence of Tony's drug business and hide it.  Miguel did so.  Tony died at the scene.  Miguel recovered from his wounds.

The forensic team that processed the apartment found blood everywhere in the apartment: "all over the walls, and window sills and carpet – everywhere."  The forensic team was able to recover two guns, two knives and a black ski mask from underneath a mattress in Tony and Carolina's bedroom.  Only one of the knives had any human blood on it.

According to Veronica, on the evening of the killing, appellant and Aguirre were talking about the fact they needed to go out and "do something."  Veronica believed appellant and Aguirre were going to do something unusual because, unlike most times the men went out, on this occasion Veronica was not invited to go with them.  Before they left, Veronica gave them a knife.  After appellant and Aguirre left in Aguirre's white Camero, Veronica watched a movie and fell asleep.

Veronica woke up when Aguirre returned to the apartment.  Appellant was not with Aguirre, and in fact, even though appellant's belongings remained in the apartment, appellant never returned to the apartment.  The following morning, Veronica went with Aguirre to have his car detailed, and at trial Veronica recalled the detailers did a very thorough job of cleaning the car.  Veronica did not see appellant again until the time of trial.

Elizabeth Escogido was 13 years old in 1991 and was a friend of Veronica.  She was also a friend of appellant.  After Tony's murder, Escogido never saw appellant again in San Diego.  However, three or four days after the murder, appellant called Escogido and told her that he was in Los Angeles.  Appellant asked Escogido if she heard about Tony's murder and told Escogido that he had some problems about money with Veronica's father and Veronica's father was "trying to get overly smart with him."
. . . .

Notwithstanding the evidence the forensic team was able to recover from the scene of the murder, the case went cold.  In 2004 a cold case detective revisited the case.  In 2004 a crime lab analyst was able to recover a DNA sample from the mouth area of the ski mask Miguel pulled off the robber who initially attacked him and eventually stabbed Tony to death.  The DNA matched a sample appellant provided to a DNA data bank.

Appellant was charged with first degree murder, use of a deadly weapon in the commission of a murder and the special circumstance he murdered his victim in the commission of a felony.  The jury found

appellant guilty of those crimes and further found the special circumstance allegation was true.

(Lodg. 5, pp. 3-6.)

Albarran describes his defense at trial, without challenging that aspect of his representation:

Petitioner's defense to the charge against him was that he had been misidentified as one of the two perpetrators of the murder and that he, in fact, did not participate in the incident at all. To this end, Petitioner's defense was proffered essentially through cross-examination of the various witnesses, many of whom, the defense was able to show, had serious credibility problems.[2]

(Dkt No. 23, 25:24-26:2; *see* Dkt No. 1-1, p. 26.)[3]

As summarized by the San Diego County Superior Court deciding Albarran's habeas petition following direct review:

Petitioner timely appealed his conviction to the California Court of Appeal. . . . Petitioner argued on appeal:  the trial court erred in two respects with regard to the felony murder special circumstance jury instruction; the trial court erred in instructing the jury about the specific intent required for the commission of murder and robbery; the prosecution committed misconduct by vouching for the credibility of witnesses, allowing a witness to offer inadmissible evidence, improperly eliciting testimony, and failing to provide crucial discovery; the evidence was not sufficient to support a conviction; the court erred when it admitted evidence of Petitioner's statements elicited in violation of *Miranda v. Arizona* (1966) 384 U.S. 436; and, the court erred when it refused to find jury misconduct.  The judgment was affirmed.

(Lodg. 9.)

Albarran petitioned the California Supreme Court for review after the judgment was affirmed, alleging:  (1) trial court error in failing to give CALCRIM No. 703, the instruction defining the requisite intent for aiding-and-abetting accomplice liability; (2) the trial court's modified CALCRIM 252 instruction inaccurately stated the law; (3) prosecutorial misconduct in purportedly vouching for its detective witnesses and coaching an eye-witness; and (4) he received a confusing preamble to the Miranda warnings which should have resulted in the suppression of statements he made to police. (Lodg. 6, pp. ii-iii.)  Review was summarily denied on April 15, 2009.  (Lodg.  7.)

\\

---

[2]  The defense case in chief consisted of one testifying witnesses, an experimental psychologist specializing in human memory perception and identification.  (Lodg. 14, RT Vol. 12, pp. 1148-1182.)

[3]  Page numbers for docketed materials cited in this R&R refer to those electronically imprinted.

4

Albarran filed his  January 21, 2010 habeas petition in San Diego County Superior Court alleging: "there was insufficient evidence to support bind over on the charges against Petitioner, the government committed misconduct in Petitioner's case, his counsel was ineffective because counsel failed to file a motion to dismiss the information, the trial court committed instructional error, there was insufficient evidence of guilt and the trial court erred by not suppressing Petitioner's statements to police elicited in violation of *Miranda, supra.*" (Lodg. 9.)  The Superior Court denied the petition on March 10, 2010, observing "habeas corpus cannot serve as a second appeal" and finding he had "tested all his claims on appeal," with the exception of "the claims of ineffective assistance of counsel and the sufficiency of the evidence at the preliminary hearing," warranting summary denial of all but those two claims. (Id.)  In denying his preliminary hearing challenges, the court concluded he should have raised any claim concerning the Information in the trial court and, under California law, his failure to do so resulted in a waiver of "any invalidity in the proceedings prior to the commitment," foreclosing his claim "that the bind over was fraught with error." (Id.)  The court also rejected his IAC claim because he did not demonstrate prejudice, applying the standards from Strickland v. Washington, 466 U.S 668, 687 (1984) and People v. Ledesma 43 Cal.3d 171, 216 (1987).  (Id.)

The Court of Appeal also denied Albarran habeas relief.  The court rejected his claim "the trial court should have set aside the indictment or information after the preliminary hearing because the witnesses were untruthful and had been coached by the prosecution" and his IAC claim that his representation was ineffective, concluding on the latter claim, as had the Superior Court, that "Albarran has not shown that had counsel moved to set aside the indictment or information, counsel would have obtained a favorable result." (Lodg. 11, p. 1.)  The court rejected his challenge to the sufficiency of the evidence because it had been "rejected on appeal." (Id.)  The court also denied his additional claim that the taking of a saliva sample constituted an unreasonable search and seizure because his DNA was already available in a law enforcement data base, applying, *inter alia*, Terry v. Ohio, 392U.S. 1, 21 (1968) and United States v. Lefkowitz, 285 U.S. 452, 464 (1932).  (Id.)

Albarran's habeas petition to the California Supreme Court alleged:  two grounds of instructional error associated with CALCRIM No. 703; prosecutorial misconduct in "vouching" for its witnesses; prosecutorial misconduct "when one of his witnesses referenced appellant's past criminal

conviction and imprisonment" in violation of a pre-trial ruling; prosecutorial misconduct in eliciting testimony from a witness that he "was afraid to testify;" prosecutorial misconduct, "however inadvertent, when its agent . . . destroyed key piece of evidence;" cumulative error from "the various incidents of prosecutional misconduct;" trial court error in "giving a modified version of CALCRIM No. 252;" insufficient evidence that he had committed or attempted to commit a robbery to support the robbery-first degree murder conviction; insufficient evidence to support findings of premeditation and deliberation; trial court error in failing to suppress his statements made after allegedly misleading Miranda advisements; and juror misconduct.  (Lodg. 12.)  That petition was summarily denied on December 15, 2010, with a citation to In re Robbins, 18 Cal.4th 770, 780 (1998).  (Lodg. 13.)

Albarran filed his federal Petition on January 5, 2011.  Ground One alleges his "preliminary hearing judge on its own motion failed to set aside case."  (Dkt No. 1, p. 11.)  Ground Two alleges various examples of purportedly "outrageous governmental misconduct" associated with the preparation and presentation of the prosecution's case and the gathering of DNA evidence.  (Id., p. 15.)  Ground Three alleges ineffective assistance of counsel for failure to file a motion to set aside the information and for purportedly assisting the District Attorney regarding an alleged promise to "supply[] citizenship to Miguel Angel Guzman Ayala [in exchange] for his testimony."  (Id., p. 16.)

Albarran presents Grounds Four through Fifteen by referencing Petition "Appendix A," stating it "adequately summarizes the procedural history and facts of the case."  (Dkt No. 1, p. 17.)  The docketed Attachment is Albarran's entire 108-page Opening Brief on direct appeal elaborating the twelve claims he pursued there.  (Dkt Nos. 1-1, 1-2; see Lodg. 2.)  The Court accordingly construes those twelve claims as Petition grounds Four through Fifteen and refers to appeal ground one as Petition Ground Four, appeal ground two as Petition Ground Five, and so forth, up to and including appeal ground twelve as Petition Ground Fifteen.  Respondent's Answer addresses each of those claims using the same approach (Dkt No. 13), and the Traverse adopts that convention (Dkt No. 23, pp. 7-10).

Respondent contends Albarran is entitled to no federal habeas relief on any of his claims.  (Dkt No. 13.)  Respondent also argues Grounds One, Two, and Three are procedurally defaulted.  Albarran concedes in his Traverse that Grounds One and Eight do not present issues cognizable in this Court

1    (Dkt No. 23, 1:24-27, 3:15-18, 55:25-56:3), but reasserts his claims in all other respects.

2    **II.    DISCUSSION**

3        **A.    Legal Standards**

4            **1.    Federal Habeas Relief**

5        A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

6    in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

7    of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a).  The Antiterrorism

8    and Effective Death Penalty Act of 1996 ("AEDPA") controls review of Albarran's habeas petition.

9    *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA imposes a " 'highly deferential standard

10   for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the

11   doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7; *see* Miller-

12   El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct

13   absent clear and convincing evidence to the contrary"), *citing* 28 U.S.C. § 2254(e)(1).

14       A petitioner can obtain federal habeas relief only if the result of a claim adjudicated on the

15   merits by a state court "was contrary to, or involved an unreasonable application of, clearly established

16   Federal law, as determined by the Supreme Court of the United States" (28 U.S.C. § 2254(d)(1)), or

17   "was based on an unreasonable determination of the facts in light of the evidence presented in the

18   State court proceeding" (28 U.S.C. § 2254(d)(2)).  To be found unreasonable under 28 U.S.C. §

19   2254(d)(1), application of the precedent "must have been more than incorrect or erroneous;" it "must

20   have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations

21   omitted).  A decision is "contrary to" federal law if (1) it applies a rule that contradicts governing

22   Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from"

23   a Supreme Court decision but reaches a different result.  Early v. Packer, 537 U.S. 3, 8 (2002)

24   (citations omitted); *see* Williams v. Taylor, 529 U.S. 362, 404-06 (2000) (distinguishing the "contrary

25   to" standard from the "unreasonable application" standard); *see also* Bell v. Cone, 535 U.S. 685, 694

26   (2002).

27       When the state court denies a federal claim on procedural grounds clearly without reaching

28   the merits, there is no state court decision to which deference is owed.  A federal habeas court will

review "a properly raised issue" *de novo* in such circumstances.  Pirtle v. Morgan, 313 F.3d 1160, 1167-68 (9th Cir. 2002) ("the AEDPA deference scheme outlined in 28 U.S.C. § 2254(d)" does not apply when the state denied post-conviction relief on procedural grounds rather than on the merits) (citation omitted).  If the dispositive state court decision reaches the merits "but provides no reasoning to support its conclusion," federal habeas courts independently review the record "to determine whether the state court clearly erred in its application of controlling federal law," although "we still defer to the state court's ultimate decision." Id. at 1167; *see* Harrington v. Richter, -- U.S. --, 131 S.Ct. 770, 784-85 (2011) (where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden must still be met by showing there was no reasonable [legal or factual] basis for the state court to deny relief").  "We construe 'postcard' denials . . . to be decisions on the merits." Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir.2005) ( "[a] decision on the merits necessarily implies that an application was 'properly filed.' "), *revised in part by* 447 F.3d 1165 (9th Cir.2006).  Federal courts apply AEDPA standards to the "last reasoned decision" by a state court addressing the claim. Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon the same ground").

### 2. **Procedural Default**

Respondent contends Albarran's Petition Grounds One, Two, and Three are procedurally defaulted.  "A federal habeas court will not review a claim rejected by a state court 'if the decision . . . rests on a state law ground that is independent of the federal question and adequate do support the judgment.' " Walker v. Martin, -- U.S. --, 131 S.Ct. 1120, 1127 (2011), *quoting* Beard v. Kindler, 588 U.S. --, 130 S.Ct. 612, 615 (2009).  "The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits."  Id. at 1127-28 (citation omitted).  The state's rule may be mandatory or discretionary, as long as it is "firmly established and regularly followed." Beard, 130 S.Ct. at 618.

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

11cv0019

violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); *see also* Cooper v. Neven, 641 F.3d 322, 328 (2011). The "good cause" showing must involve an "objective factor outside of a prisoner's control." Walker, 131 S.Ct. at 1127. The "prejudice" showing requires the petitioner to establish "the errors . . . worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." Id. (citations omitted).

In California, habeas petitioners may have their claims denied as untimely without a merits review if they "substantially delay" presenting them without justification. In re Clark, 5 Cal.4th 750, 765, n.5 (1993). "A summary denial citing Clark and Robbins means that the petition is rejected as untimely." Walker, 131 S.Ct. at 1126, 1130-31 (holding California's untimeliness rule is "adequate" for procedural default purposes when the petitioner subsequently presents for federal habeas relief the same claims that were rejected on untimeliness grounds in state court, reversing a Ninth Circuit determination that the California untimeliness bar of Clark and Robbins was not "adequate" because not firmly defined or consistently applied). The Ninth Circuit has recognized that California's untimeliness rule became unequivocally "independent" of federal law in 1998 with the California Supreme Court decision In re Robbins, 18 Cal. 4th 770 (1998), a case holding that California courts would no longer consider the federal constitutional merits of a state habeas petition when enforcing the state's untimeliness bar. *See* Bennett v. Mueller, 322 F.3d 573, 581-83 (9th Cir. 2003).

State courts may decide a claim on the merits notwithstanding the applicability of an untimeliness rule, without application of the rule being found arbitrary. Walker, 131 S.Ct. at 1126; *see also* Bennett, 322 F.3d at 580 ("A state court's application of a procedural rule is not undermined where, as here, the state court simultaneously rejects the merits of the claim"). Thus, a state procedural bar may count as an adequate and independent ground for denying a federal claim even if the state court exercised its discretion "to by-pass a timeliness issue and, instead, summarily reject the petition for want of merit." Walker, 131 S.Ct. at 1126, *citing* Robbins, 18 Cal.4th at 778, n.1.

It is recommended the Court find, as Respondent contends, that the state courts denied Petition Grounds One, Two, and Three on adequate and independent state law grounds, as reflected in the Superior Court's and Court of Appeal's reasoned decisions and in the California Supreme Court's

summary denial of habeas review with a citation to <u>Robbins</u>, 18 Cal.4th at 780.  *See* <u>Walker.</u> 131 S.Ct. at 1124 ("California courts signal that a habeas petition is denied as untimely by citing the controlling decisions, *i.e.*, *Clark* and *Robbins*").  Albarran has thus procedurally defaulted those claims for purposes of federal habeas review, and he has not attempted to demonstrate excusable cause for the delay in presenting those claims in state court nor the prejudice required to overcome the default. Those claims should be **DENIED** on that basis.  Even were the Court to decide the procedural default issue differently, it is recommended that  federal habeas relief be **DENIED** on the merits of those claims, for the reasons discussed below.

**B.     Ground One:  Failure To Set Aside The Information At Preliminary Hearing**

Albarran asserts federal habeas relief is warranted due to allegedly coached and untruthful witness testimony at his preliminary hearing. (Dkt No. 1, p. 11.)  The Superior Court and the Court of Appeal rejected this claim on habeas review as waived, and the California Supreme Court summarily denied his habeas petition containing the claim as untimely.  Respondent contends not only is this issue procedurally defaulted, but also it presents no federal question for which relief may be granted.  In his Traverse, Albarran disputes that Ground One is procedurally defaulted (Dkt No. 23, 1:24-27), but "[a]fter consideration, Petitioner concedes that, whether the trial court erred or not when it failed to set aside the case at the preliminary hearing, is not a federal question" for which relief may be granted (<u>Id.</u>, 30:2-6).  It is recommended the Court construe his concession as an abandonment of the claim and **DENY** relief on Ground One on that basis.

**C.     Ground Two:  Governmental Misconduct**

Albarran alleges the state courts unreasonably rejected his claims of "outrageous governmental misconduct" in the form of "over zealous San Diego Police Department, the District Attorney's Office presented the case poorly in the preparations thereof," including allegedly "mak[ing] . . . promises and threats to all witnesses in this case," use of their "authority to incite, provoke and to intimidate witnesses into testifying to what the Government felt was suitable to obtain a conviction," and their "conduct had caused Petitioner to be subjected to unreasonable search and seizure" in the form of a saliva swab to collect a DNA sample.  (Dkt No. 1, p. 15.)  He raised on direct appeal all but the Fourth Amendment DNA issue.  (*See* Lodg. Nos. 2, 5.)

In the context of federal habeas review of unconstitutional state trial errors, Albarran mistakenly represents:  "The test for prejudice in an instance of prosecutorial misconduct, where a federal constitutional error is involved, is the burden is on the state to prove the error was harmless beyond a reasonable doubt."  (Dkt No. 23, 60:21-24, *citing* Chapman v. California, 386 U.S. 18, 24 (1967).)  Rather, the harmless error standard of Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) applies "uniformly in all federal habeas corpus cases under § 2254" to a review of unconstitutional trial errors regardless of which of those standards, if any, the state courts applied in deciding the claim. Bains v. Cambra, 204 F.3d 964, 977 (9th Cir.2000) (that is, whether the error had a "substantial and injurious effect or influence in determining the jury's verdict").

The Court of Appeal reached and denied relief on the merits of Albarran's allegations:  (1) the prosecutor improperly vouched for the credibility of a police detective and an investigator who were present during an interview with Miguel; (2) a trial witness improperly and prejudicially referenced a government criminal DNA database during testimony; (3) a police detective lost a videotaped interview of Elizabeth Escogido; and (4) cumulatively, that misconduct requires reversal.  (Lodg. 5, pp. 16-28.)  The Court addresses those discrete claims individually below in connection with Petition Grounds Six, Seven, Nine, and Ten, respectively, and recommends each be **DENIED**.

In deciding Albarran's habeas petition, the Superior Court denied relief on all but his preliminary hearing irregularities and IAC claims on grounds matters previously raised and rejected on appeal are not cognizable on collateral review, and he demonstrated no special circumstances to avoid that rule. (Lodg. 9, pp. 2-3.)  With respect to the preliminary hearing issues, the court found:

> Further, Petitioner's challenge to the bind over should have been raised in the trial court.  Failure to so challenge the information renders any invalidity in the proceedings prior to the commitment waived.  (*In re Hannie* (1970) 3 Cal.3d 520, 528); *In re Razutis* (1950) 35 Cal.2d 532, 534.)  Thus, the claim that the bind over was fraught with error is denied.

(Lodg. 9, 2:14-28.)

As recommended above, applying procedural default legal standards, relief on Ground Two should be **DENIED** for Albarran's failure to make the required cause and prejudice showing to overcome the state's adequate and independent state law untimeliness bar to reaching the merits of this

1   claim on federal habeas review.  *See* Walker, 131 S.Ct. at 1124.  In addition, Albarran relies on no

2   controlling United States Supreme Court authority that suggests alleged pre-trial error of this nature

3   can provide a cognizable basis to disturb a conviction after a subsequent full and fair trial, foreclosing

4   relief on this theory.  28 U.S.C. § 2254(d)(1).

5         **1.**    **DNA Collection Issue**

6        Even were the Court to reach the merits of Albarran's unreasonable search and seizure

7   argument, AEDPA standards foreclose relief.   The Court of Appeal rejected his Fourth Amendment

8   claim that the collection of a saliva sample for DNA testing was unreasonable because "Petitioner's

9   D.N.A. was already" available in the California Department of Corrections and Rehabilitation data

10   bank. (Dkt No.1, p. 15.)  The Court of Appeal explained:

> 11       The Fourth Amendment prohibits all "unreasonable" searches,
> whether conducted with or without a warrant.  (*United States v.*
> 12   *Lefkowitz* (1932) 285 U.S. 452, 464.)  Reasonableness is determined by
> balancing the need to search against the invasion which the search
> 13   entails. (*Terry v. Ohio* (1968) 392 U.S. 1, 21.)  Appropriate procedures
> to retrieve evidence from the human body are neither "unreasonable"
> 14   per se under the Fourth Amendment, nor violations of "due process"
> procedures guaranteed by the Fifth and Fourteenth Amendments.
> 15   (*People v. Scott* (1978) 21 Cal.3d 284, 293.)  "[W]here a warrant [or
> court order] authorizing a bodily intrusion is sought, the issuing
> 16   authority after finding probable clause to believe the intrusion will
> reveal evidence of crime, must apply an additional balancing test to
> 17   determine whether the character of the requested search is appropriate.
> Factors which must be considered include the reliability of the method
> 18   to be employed, the seriousness of the underlying criminal offense and
> society's consequent interest in obtaining a conviction [citations], the
> 19   strength of law enforcement suspicions that evidence of crime will be
> revealed, the importance of the evidence sought, and the possibility that
> 20   the evidence may be recovered by alternative means less violative of
> Fourth Amendment freedoms. [Citations.] [¶] These considerations
> 21   must, in turn, be balanced against the severity of the proposed
> intrusion." (*Ibid.*)
> 22
> 23       Albarran has not provided documentation of the postarrest DNA
> evidence gathering to support his claim of unlawful search [e.g.,
> discovery requests, motions, opposition, court order for testing].  The
> 24   minimally invasive swab for saliva to compare a defendant's DNA in
> a prosecution for murder with DNA the defendant has previously
> 25   provided is not per se an unreasonable search.

26   (Lodg. 11, p. 2.)

27        It is recommended the Court find the state court identified the proper legal standard controlling

28   this issue and applied it in an objectively reasonable manner to conclude Albarran demonstrated no

11cv0019

Fourth Amendment violation occurred.  He cites no United States Supreme Court authority contrary to the state court's determination, and his conclusory allegations are insufficient to warrant disturbing the state court result.  Moreover, Albarran does not contend there was any discrepancy in the DNA matches among the CODIS data base sample, the ski mask sample, and his saliva swab sample, so any unconstitutional error associated with the DNA collection cannot be construed as having caused him any prejudice.  Brecht, 507 U.S. at 623.  Relief on this ground should be **DENIED**.

### 2.    Prosecutorial Misconduct Through False Evidence Or Unrevealed Promises

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," and that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  Napue v. Illinois, 360 U.S. 264, 269 (1959).  Prosecutorial misconduct amounting to a due process violation under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) can also be found where the prosecution fails to disclose a secret deal with a witness.  See Giglio, 405 U.S. at 154 (government failed to disclose an alleged promise to its key witness that if he testified for the government at trial, he would not be prosecuted).  "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule" that nondisclosure of a secret deal with a witness constitutes prosecutorial misconduct amounting to a due process violation.  Id.

However, "there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  Strickler v. Greene, 527 U.S. 263, 281 (1999).  The decisive question under Brady and Giglio is whether the evidence withheld from the jury is material, that is, whether there is a "reasonable probability" of a different result had the evidence been presented.  See Kyles v. Whitley, 514 U.S. 419, 434 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"); see also United States v. Kohring, 637 F.3d 895, 901 (9th Cir. 2011) (citations omitted).

13

The Court should reject Albarran's arguments that the witnesses against him at his preliminary hearing gave false or coerced testimony at the instigation of the prosecution, with the allegedly unconstitutional consequence that he was wrongfully bound over for trial. (Dkt No. 1, pp. 11-14.) First, under California law, he defaulted any challenges to the pre-trial bind over. (*See* Lodg. 9, 2:25-28); Harris v. Reed, 489 U.S. 255, 260-261 (1989) (a federal habeas claimant's procedural default under state law precludes federal habeas review absent a showing of cause and prejudice). Second, the preliminary hearing witnesses were also trial witnesses. Defense counsel thoroughly cross examined them in front of the jury with questions expressly exploring the possibility of improper prosecutorial coaching on the identification and inducement issues, followed by rebuttal testimony.

The record reflects, for example, defense counsel sought to have Miguel testify at trial that the prosecutor told him what answers to give at the preliminary hearing. (Lodg. 14, RT Vol. 9, 777:8-22.)

> Q.  "Question:  Did Mr. Myers, the prosecutor, tell you what you needed to say?"  Your answer:  "He told me how to answer the questions that were going go be made to me."  Do you remember that question and answer now?
>
> A.  Yes.
>
> Q.  When you said that he told you how to answer the questions, do you mean he told you what answers to give?
>
> A.  No.
>
> Q.  Isn't it true that your answer to that same question on that day was yes?
>
> A.  Well, I was confused.

(Lodg. 14, RT Vol. 9, 778:2-14.)

Counsel also asked Miguel whether, in a December 2004 meeting, then-sergeant Duran or Robert Baker, a district attorney investigator assigned to the cold case homicide division (Lodg. 14, RT Vol. 10, 907:1-3), told him they "were having trouble finding a witness that was able to identify the defendant" and "indicated it was important for [Miguel] to be able to identify the defendant;" Miguel clarified they conveyed to him:  "That they were not being able to find the person who was guilty of committing the crime."  (Id., RT Vol. 9, 778:26-779:10.)  Counsel also had Miguel confirm

that he had never been presented with a live lineup, but only with a photo lineup containing six images "similar to court's Exhibit 38," and he had stated before the May 10, 2005 preliminary hearing he was "sure" the person who committed the crime was "none of those," whereas after being prepared for that hearing, he identified Albarran while testifying there. (Id., 779:19-780:24.)

In response to those defense suggestions, Lieutenant Duran testified that Miguel was not told by any of the investigating officers or the prosecutor, in those meetings when he was translating the conversations, that he should identify as the murderer whoever was produced in court as the defendant at the preliminary hearing, as suggested by defense counsel, or that he should do anything other than tell the truth. (Lodg. 14, RT Vol. 10, pp. 879-880.) He confirmed Miguel said he did not recognize anyone in the photo lineup shown to him, but testified Miguel also told him "if he saw the person – the individuals in person, that he may be able to identify them." (Id., 876:24-877:8.) Duran also confirmed that both Carolina Chavez and Veronica Chavez both identified Albarran from photo lineups shown to them.[4] (Id., pp. 871-874.)

Investigator Baker testified he observed no instance where anyone preparing Miguel or any other witnesses to testify at the preliminary hearing urged them to identify the defendant produced at the hearing as the person who committed the crime. (Lodg. 14, RT Vol. 10, 919:24-920:9, 923:12-18.) He confirmed Miguel stated during an interview translated by Duran that he could not identify anyone out of the photo lineup, but "could possibly identify the person -- the subject in person." (Id., 916:17-25.) Baker, like Duran, refuted the coaching accusations and testified that at the time he, too, "had no idea" in advance of his testimony whether Miguel was going to identify Albarran at the preliminary hearing, but that "when he looked at Mr. Albarran that morning in the preliminary hearing and he was asked if he saw anybody in court . . . . he identified Mr. Albarran . . . in short order." (Id., 924:10-24; see Id., 882:2-11.) He also testified that during an interview with Miguel the week before

---

[4] Veronica Chavez testified at trial the police showed her a "six pack" photo lineup of possible suspects in 2004 and she recognized "Ody" (Albarran) at that time, the same person she identified in court. (Lodg. 14, RT Vol. 9, 797:28-798:11.) On cross-examination, she authenticated Exhibit 40 as a copy of that photo lineup. (Id., 814:13-815:2.) She also testified she was shown that photo lineup at Albarran's preliminary hearing and testified then, as she did at trial, that she "immediately recognized" him, and that he was also known as "Shorty." (Id., 815:5-817:7.) She also testified she recognized Exhibit 38, the photo lineup with Carolina's signature on it. (Id., 813:25-814:11.) Veronica admitted she lied to police in 1991 when she told them about a friend of Albarran's, Chikiz, in order to protect her boyfriend, Oscar, from being implicated in the crime. (Id., 796:4-797:27; see also Id., 831:7-27; Id., 832:18-24.)

15                                                                                    11cv0019

trial began, an investigator certified in Spanish who stepped in to assist in trial preparations after Lieutenant Duran was promoted, translated that Miguel was "very certain" about his identification of Albarran at the preliminary hearing.  (Id., 925:13-926:5.)   This aspect of Albarran's prosecutorial misconduct claims thus became an issue solely entrusted to the factfinder, outside the scope of federal habeas review.

None of the state court decisions separately discusses Albarran's particular allegation that Miguel was promised immigration assistance in exchange for his allegedly false testimony.  Like the other prosecutorial misconduct allegations, this claim must fail because that accusation was fully explored on the record at trial.  Miguel testified on direct that he was originally from Honduras. (Lodg. 14, RT Vol. 9, 744:26-28.)   He admitted he was in the United States illegally.  (Id., 774:24-26.) On cross, defense counsel asked Miguel questions aimed at eliciting evidence of prosecutorial promises that could undermine his credibility and impeaching him with prior inconsistent statements.

> Q.  Isn't it true that at some point, members from the prosecution team discussed with you your citizenship and your ability to stay in the United States legally?
>
> A.  No.
>
> Q.  Do you recall your testifying in this courthouse at an earlier hearing in this case?
>
> A.  Yes.
> . . . .
>
> Q.  During that hearing, when I asked you, "Did either of them at any point discuss with you your citizenship or ability to stay in the United States legally?"  You answered Yes, right?
>
> A.  Yes.
>
> Q.  And when I asked you who you spoke to about that, you said, "The detective or Jorge Duran and his partner," right?
>
> A.  Yes.
>
> Q.  Isn't it true that you and the prosecutor describe some sort of visa that would be given to you to stay in the United States legally?
>
> A.  No.
>
> Q.  Isn't it true that at that same hearing, in which you testified under oath, in answer to that same question, you said, "He hasn't yet processed anything, but he told me he would do everything possible"?

A.  I was confused.

. . .

THE COURT:  . . . [Reading from the preliminary hearing transcript], The question was, "And did the prosecutor ever describe to you some sort of visa that would be given to stay in the United States legally? Answer: He hasn't yet processed anything, but he told me he would do everything possible."  Do you remember that question and remember that answer?

THE WITNESS:  Yes.

(Lodg. 14, RT Vol. 9, 775:2-777:5.)

The prosecutor rebutted the defense suggestions that Miguel had been pressured to identify Albarran as the killer and that he may have been promised immigration consideration.  For example, Lieutenant Duran testified in pertinent part:

Q.  Did you ever arrange a meeting between me and Miguel Ayala before the morning of the prelim?

A.  No, I did not.

Q.  Before the morning of the prelim or any time you had any contact with him, was there any mention of any government agency helping Miguel Ayala with is visa or with his I.N.S. paperwork or anything like that?

A.  No.

Q.  Well, you heard statements to that effect during the preliminary hearing; is that correct?

A.  Yes.

Q.  What did you attribute those to?

. . .

THE WITNESS:  Mr. Ayala was concerned for his immigration status in this country and was concerned that he, at some point, may be deported.  I reassured him he was a victim and a witness to a crime, that we did not have the authority to deport him or arrest him for any immigration violation.

Q.  And that's what you told Miguel Ayala?

A.  Yes.

Q.  Was there any promises of help from federal agencies or anything like that?

A.  No.

(Lodg. 14, RT Vol. 10, 877:23-878:20.)

17

11cv0019

Investigator Baker's testimony also rebutted defense suggestions the prosecutor or his agents allegedly made promises in exchange for testimony or sought to influence witnesses:[5]

> Q. Was there ever a time where you conveyed through Sergeant Duran any type of promises or any type of favoritism or any type of favor with regard to I.N.S. or visas or anything like that to Miguel Ayala?
>
> A. No.
>     . . .
> Q. And were you present when Miguel Ayala was prepared to testify in court [at the preliminary hearing]?
>
> A. Yes, I was.
>     . . .
> Q. Was Sergeant Duran interpreting for me [as the prosecutor prepared Miguel to testify the morning of the preliminary hearing]?
>
> A. Yes, he was.
>
> Q. Was there ever a point where I said to Miguel Ayala that I was going to fill out his paperwork for I.N.S. or get a visa for him or anything like that?
>
> A. No.

(Lodg. 14, RT Vol. 10, 917:21-918:27.)

Unlike the circumstances contemplated in the Brady/Giglio context, this record reflects the purported promises or coaching were not concealed.  The factfinders were able to consider whether such conduct occurred and retained their prerogatives to weigh the evidence and to make credibility determinations in reaching their verdict.  It is recommended the Court reject Albarran's attempt to undermine confidence in the fairness of his trial or the verdict on this theory and **DENY** habeas relief.

**D.     Ground Three:  Ineffective Assistance Of Counsel ("IAC")**

Albarran alleges as Ground Three IAC for counsel's failure to file a "motion under §995. (A),

---

[5]  After Miguel was excused as a witness, with the jury absent, the prosecutor, Mr. Myers, objected to the "accusations against me during the course of this trial," suggesting "probably I would feel that it would be relevant for counsel to bring up Mr. Ayala and whether he's deluded that he's getting help with his immigration status."  (Lodg. 14, RT Vol. 9, 782:10-14.)  He told the court:  "At one point during a recess at the preliminary hearing, [defendant's co-counsel] said, 'I believe that none of those things happened, Mr. Myers.' It was during a time when Ayala was saying yes to everything, every single thing being asked."  (Id., 782:15-19.)  The prosecutor identified defense questioning that required a response, in particular the line of questioning inquiring whether the prosecutor told Miguel, " 'Whoever is in court, just identify that person,' " a statement that the prosecutor intended to "clear up" through the detective witnesses, reminding defense counsel "[i]t is misconduct to accuse counsel of something without proof."  (Id., 782:15-783:5.)  He expressed his discomfort "with regard to constant accusations in this case, both at the prelim and here."  (Id., 783:7-14.)  The court noted the previously-asked question and answer were in the record and pre-approved anticipated arguments regarding Miguel's lack of sophistication.  (Id., 783:23-28.)

18

1   (B), (1), 2; and § 999 when the evidence surfaced of perjured testimony from each and every witness

2   who had testified" at his preliminary hearing.  Those code identify the means to challenge non-

3   jurisdictional irregularities under California law, including motions to set aside an information when

4   the defendant has allegedly been indicted without reasonable or probable cause.  Albarran contends

5   that instead of moving to set aside the information, counsel "sat on his hands" and "assist[ed] the

6   District Attorney and vouched when 'evidence' surfaced about promise[] of supplying citizenship to

7   Miguel Angel Guzman Ayala for his testimony."  (Dkt No. 1, p. 16.)   He argues that the resulting

8   determination to bind him over for trial and the "results in determining Petitioner guilty in this case

9   prior to trial would have decreased dramatically" had his attorney done so.  (Id.)

10      Respondent contends this claim is procedurally defaulted, as signaled by the California

11   Supreme Court's citation to Robins in summarily denying Albarran's habeas petition.  (Dkt No. 13,

12   p. 48; see Lodg. 13; see Walker, 131 S.Ct. at 1124.)  Both the Superior Court and the Court of Appeal

13   denied him habeas relief on this claim both for failure to overcome the state law procedural default

14   and for failure to satisfy the prejudice prong of an IAC claim.  (Lodg. 9, Lodg. 11.)  Albarran disputes

15   that the claim is procedurally defaulted, summarily arguing he "established good cause for the delay

16   and, the California Supreme Court's finding to the contrary was the result of an unreasonable

17   application of clearly established [federal] law . . . and was the product of an unreasonable

18   determination of the facts."  (Dkt No. 23, 35:10-14.)  However, his conclusory characterizations are

19   unsupported by any factual underpinning, and he relies on no apposite United States Supreme Court

20   authority. It is recommended the Court **DENY** habeas relief on Ground Three for those reasons.

21      Even if the Court were to reach the merits of his IAC claim, judicial scrutiny of counsel's

22   performance is "highly deferential."  Strickland, 466 U.S. at 689.  Reviewing courts approach an IAC

23   claim with the "strong presumption" that counsel "rendered adequate assistance and made all

24   significant decisions in the exercise of reasonable professional judgment."  Cullen v. Pinholster, --

25   U.S. --, 131 S.Ct. 1388, 1403 (2011) (citation omitted).  To prevail, the claimant must demonstrate that

26   counsel failed to exercise reasonable professional judgment and resulting prejudice.  Strickland, 466

27   U.S. at 690, 694.  To prove constitutional error on the objectively unreasonable performance element,

28   "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not

1  functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " <u>Harrington</u>, 131

2  S.Ct. at 787, *quoting* <u>Strickland</u>, 466 U.S. at 687, 688.  To prove prejudice, "[t]he defendant must

3  show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

4  the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 690, 694; *see* <u>Harrington</u>, 131

5  S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable").  "[E]ven

6  a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

7  <u>Harrington</u>, 131 S.Ct. at 791-92 (reversing a Ninth Circuit en banc grant of habeas relief on an IAC

8  claim for lack of sufficient deference to a state court result).

9       Albarran argues that "when it [allegedly] became clear that the testimony offered by the

10  prosecution was the product of perjury and was obviously scripted" at his preliminary hearing, his trial

11  attorney should have moved to set aside the charges against him.  (Dkt No. 23, 34:25-27.)  He

12  contends "there is a reasonable probability that, had counsel made that motion, the court would of

13  agreed and granted the motion."  (<u>Id.</u>, 35:27-36:1.)  The Superior Court correctly identified and

14  reasonably applied the <u>Strickland</u> standards to conclude he failed to make the showing required

15  showing to warrant relief:

16            Finally, Petitioner has not shown that counsel's failure to file the motion to dismiss the information was an unreasonable decision *and*

17            resulted in prejudice to Petitioner.  (*Strickland v. Washington* (1984) 466 U.S 668, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)  In

18            other words, Petitioner has not shown that the motion, if it had been made by counsel, would have resulted in the dismissal of the charges

19            and termination of the prosecution against Petitioner *and* that counsel's decision to forgo the motion was not [a] tactical decision.

20  (Lodg. 9, 3:1-7; *see* Lodg. 11, p. 1 (the Court of Appeal reached the same result).)

21       In order to prevail as a federal habeas petitioner, Albarran "must show that the [state court]

22  applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner."  <u>Bell</u>, 535 U.S. at

23  698-99.  "The standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' and when

24  the two apply in tandem, review is 'doubly' so."  <u>Harrington</u>, 131 S.Ct. at 788, 791-92 (citations

25  omitted).  Accordingly, even if Albarran's IAC claim were not procedurally defaulted, applying the

26  "double deference" required on federal habeas review of IAC claims, it is recommended the claim be

27  **DENIED,** as the state court result comports with controlling federal authority, and it is not based on

28

an unreasonable determination of the facts in light of the evidentiary record.  28 U.S.C. § 2254(d).

### E.   Instructional Error

#### 1.   Legal Standards

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause."  Sullivan v. Louisiana, 508 U.S. 275, 277 (1993).  "The prosecution bears "the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements. . . ."  Id. at 277-78 (citations omitted).  A state court's construction of state law binds this court.  *See* Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (*per curiam*); Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (the fact that a jury instruction "was allegedly incorrect under state law is not a basis for habeas relief").  Federal habeas relief based on instructional error is warranted only if there is "reasonable likelihood" the jury was actually led to an unconstitutional result as a consequence of that error.  Estelle, 502 U.S. at 73, n.4, *quoting* Boyde, 494 U.S. at 379-80, 381-83 (finding it improbable that the jury actually interpreted erroneously an arguably ambiguous penalty phase instruction in a capital case, after examining the challenged instruction in the context of the entire proceedings and jury charge).

On federal habeas review of alleged instructional error, "[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Estelle, 502 U.S. at 72-73, *quoting* Cupp v. Naughten, 414 U.S. 141, 147 (1973).  "A single instruction to a jury may not be judged in artificial isolation, but rather must be viewed in the context of the overall charge."  Cupp, 414 U.S. at 146-47; *see also* Mejia v. Garcia, 534 F.3d 1036, 1045 (9th Cir. 2008).  The instructions Albarran's jury received are provided in Lodgement 1, CT 0210-0257.  For the reasons discussed below in connection with his three discrete instructional challenges, it is recommended the Court find Albarran's conviction was not the result of any unconstitutional instructional error.  *See* Neder v. United States, 527 U.S. 1, 12, 18 (1999) (instructional error is harmless where it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error").  The Court should find, even if there was instructional error in any of the alleged particulars, none "so infect[] the entire trial that the resulting conviction violate[d] due process."  Henderson v. Kibbe, 431 U.S. 145, 154 (1977), *quoting* Cupp, 414 U.S. at 147.

1

### 2.   Ground Four

2      Albarran alleges as Ground Four the trial court committed reversible error by "failing to

3  instruct with CALCRIM No. 703" addressing the required intent for accomplice liability, which he

4  contends must be "given *sua sponte* when a robbery special circumstance is alleged and the accused

5  may not have been the actual killer."  (Dkt No. 1-1, pp. 32-40.)

6      Under California law, a trial court has a *sua sponte* duty to instruct when there is substantial

7  evidence to support a theory the defense is relying on or when there is evidence to support a theory

8  that is not inconsistent with the defense theory.  *See* <u>People v. Abilez</u>, 41 Cal.4th 472, 517 (2007); *see*

9  *also* <u>People v. Salas</u>, 37 Cal.4th 967, 982 (2006) (the determination whether substantial evidence

10  supports a theory addresses "only whether there was evidence which, if believed by the jury, was

11  sufficient to raise a reasonable doubt") (citation omitted).  The court must instruct only on those

12  principles of law "commonly or closely and openly" connected with the facts of the case.  <u>People v.</u>

13  <u>Davis</u>, 36 Cal.4th 510, 570 (2005) (no duty to instruct on the court's own initiative unless "some

14  significant evidence could have supported a finding" addressed by the instruction).)  The Court of

15  Appeal explained:

16              Although the trial court provided the jury with a version of
      CALCRIM 730 "Special Circumstances:  Murder in Commission of
17      Felony, Pen. Code § 190.2(A)(17)," the trial court was not asked and
      did not give the jury CALCRIM No. 703 "Special Circu[m]stances:
18      Intent Requirement for Accomplice After June 5, 1990-Felony Murder,
      Pen. Code § 190.2(d)."  In pertinent part, CALCRIM No. 703 states:
19      "If the defendant was not the actual killer, then the People have the
      burden of proving beyond a reasonable doubt that (he/she) acted with
20      either the intent to kill or with reckless indifference to human life and
      was a major participant in the crime for the special circumstance[s] of
21      [section 190.2, subdivision (a)(17)(A)] to be true.  If the People have
      not met this burden, you must find (this/these) special circumstance[s]
22      (has/have) not been proved true [for that defendant]."  The Bench Note
      to CALCRIM No. 703 states:  "The court has a sua sponte duty to
23      instruct the jury on the mental state required for accomplice liability
      when a special circumstance is charged and there is sufficient evidence
24      to support the finding that the defendant was not the actual killer.
      [Citation.]"

25  (Lodg. 5, pp. 6-7.)

26      The Court of Appeal acknowledged and reconciled a discrepancy in the testimonial evidence

27  before finding "there was no factual basis upon which the jury could have concluded appellant was

28

22

a mere accomplice who did not actually kill Tony." (Lodg. 5, pp. 7-8.) Accordingly, "there was no

basis upon which the trial court was required to give CALCRIM No. 703." (Id.)

> [T]here was no evidence which suggested the taller robber, who remained masked, knifed Tony. According to Miguel, he unmasked the shorter robber, the shorter robber knifed Miguel until Miguel could no longer fight and the shorter robber then began knifing Tony. According to Miguel, only the shorter robber knifed Tony. According to Carolina, when she walked into the living room of the apartment, she saw Tony fighting with the shorter unmasked robber while the taller masked robber was fighting with Miguel.

> Admittedly, Miguel and Carolina's recollection of the murder differ in that, according to Miguel, when the shorter robber stopped fighting with Miguel, he joined the other robber in attacking Tony, and, according to Carolina, she saw only the shorter robber fighting with the bloodied Tony. This variation in recollection does not assist appellant. Under neither version of events did the taller masked robber knife Tony. Moreover, contrary to appellant's suggestion the strong inference appellant was the actual killer, which was raised by the DNA found on the ski mask, was not undermined by the fact that the forensic team found the mask beneath a mattress in the bedroom. In light of Miguel's apparent frantic effort to hide drug-related items before the police arrived, discovery of the mask in the bedroom beneath the mattress was not surprising.

(Lodg. 5, pp. 7-8.)

The Court of Appeal continued:

> [E]ven if the trial court erred in failing to give CALCRIM No. 703, the error was harmless. Significantly, as we have noted, the jury found appellant personally used a weapon in the commission of a crime. Because only one knife with blood on it was found in the apartment and only the shorter robber was identified as the robber who knifed Tony, the personal use finding is convincing proof the jury believed appellant was the actual killer. Thus, we have no doubt that even if the jury was given CALCRIM No. 703, the jury would have found appellant guilty of murder because plainly the jury did not believe appellant was merely an accomplice in Tony's murder. (See *People v. Jones* (2003) 30 Cal.4th 1084, 1120.)

(Lodg. 5, p. 8.)

It is recommended the Court find the state court reasonably found the facts in concluding no

*sua sponte* duty arose for the trial court to instruct the jury with CALCRIM No. 703. The evidentiary

record does not support a finding Albarran was not the actual killer. Moreover, his defense theory was

essentially mistaken identity because he purportedly was not present. Even if the Court reaches a

different conclusion on the propriety of giving that instruction, it is recommended the Court find any

such error was harmless.  The state court demonstrated there is no reasonable likelihood of a different outcome had that instruction been given, based on factual determinations from the evidentiary record to which this Court must defer.[6]  *See* <u>Estelle</u>, 502 U.S. at 73, n.4 (federal habeas relief is warranted only if there is a "reasonable likelihood" the jury was actually led to an unconstitutional result based on instructional error).  Accordingly, relief should be **<u>DENIED</u>** on Ground Four.

### 3.   <u>Ground Five</u>

Ground Five alleges the trial court gave a defective CALCRIM No. 730 felony-murder special circumstance instruction.   In particular, Albarran contends the trial court "misread CALCRIM No. 730" and that purportedly reversible error "was exacerbated by the fact the written instruction was likewise defectively written."  (Dkt No. 1-1, pp. 41-48.)  He argues the defect created an ambiguity the Court should find resulted in his unconstitutional conviction.

When a petitioner challenges an ambiguous instruction, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." <u>Estelle</u>, 502 U.S. at 72-73, *quoting* <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990); *see* <u>Mejia</u>, 534 F.3d at 1045.  The Court of Appeal rejected this claim on the merits, finding the trial court's version of CALCRIM No. 730 was not defective.  (Lodg. 5, pp. 8-14.)

The trial court gave the jury the following special circumstance instruction:

> The defendant is charged with the special circumstance of murder committed while engaged in the commission of a Robbery.  To prove that this special circumstance is true, the People must prove that: 1.  The defendant committed or attempted to commit or aided and abetted a Robbery; 2.  The defendant did an act that caused the death

---

[6]  In his Traverse, Albarran does not dispute the evidentiary record as summarized by Respondent and by the state courts.  Rather, he  proffers different inferences he contends are the correct ones, insisting he was deprived of due process and a fair trial by the omission of an accomplice liability instruction in the special circumstance context.  (Dkt No. 23, pp. 36-39.)  His jury did receive "aiding and abetting" instructions associated with the murder theories.  (*See* Lodg. 14, RT Vol. 12, pp. 1239:19-1240:18, pp. 1243-1244.)  He also contends the Court "should hold an evidentiary hearing because Petitioner has established a 'colorable claim for relief and has never been afforded a state or federal hearing.' " (<u>Id.</u>, 39:12-17.)  However, not only is he mistaken regarding his opportunities to present this claim on a fully-developed factual record in state court, but also AEDPA substantially restricts a federal habeas court's authority to hold an evidentiary hearing.  *See* 28 U.S.C. § 2254(e); <u>Cullen v. Pinholster</u>, -- U.S. -, 131 S.Ct. 1388 (Apr. 4, 2011); *see also* <u>Baja v. Ducharme</u>, 187 F.3d 1075, 1077 (9th Cir. 1999); <u>Bragg v. Galaza</u>, 242 F.3d 1082, 1085, 1089-90 (9th Cir. 2001).  Moreover, "an evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record," as is the case here.  <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998).  It is recommended under none of his theories does Albarran satisfy the showing required to warrant an evidentiary hearing here, and that request should be **<u>DENIED</u>**.

of another person; AND 3.  The act causing the death and the Robbery were part of one continuous transaction; AND **4.  There was a logical connection between the act causing the death and the Robbery must involve more than just their occurrence at the same time and place**.

To decide whether the defendant and perpetrator committed or attempted to commit robbery, please refer to the separate instruction that I will give you on that crime. To decide whether the defendant aided and abetted a crime, please refer to the separate instructions that I will give [y]ou on aiding and abetting.  You must apply those instructions when you decide whether the People have proved this special circumstance.

The defendant must have intended to commit or aided and abetted in Robbery before or at the time of the act causing the death. In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit Robbery independent of the killing.  If you find that the defendant only intended to commit murder and the commission of Robbery was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved.

(Lodg. 14, RT Vol. 12, 1247:15-1248:17 (*internal capitalization and enumerations added to reflect the appearance in the written version of this instruction as provided to the jury* (Lodg. 1, CT 0252-0253) (bolding added)); *see also* Lodg. 14, RT Vol. 12, 1213:7-1213:18.)

The Court of Appeal acknowledged, "[a]s appellant points out, 'the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death.' "  (Lodg. 5, p. 8, *quoting* <u>People v. Cavitt</u>, 33 Cal.4th 187, 193 (2004).)  The court  noted that the trial court, in both the oral recitation and the written version of CALCRIM 730 provided to Albarran's jury, omitted a phrase normally part of the standard version.  (<u>Id.</u>, p. 9.)  In its intended entirety, the language after the number "4" as reproduce above would normally include the following italicized phrase (omitted in Albarran's case):  "There was a logical connection between the act causing the death and the Robbery. *The connection between the fatal act and the [robbery]* must involve more than just their occurrence at the same time and place." (<u>Id.</u>)

In giving CALCRIM No. 730, the trial court omitted the italicized phrase . . ., so that as read by the trial court the instruction required proof "there was a logical connection between the act causing the death and the robbery must involve more than just their occurrence at the same time and place."  The written instruction given to the jury contained the same omission.  Appellant contends the instruction, as given, was a "discombobulated sentence" and "[a]s a result of the defective instruction given in the instant case, the requirement for the

25

causal relationship was set out, but the requirement for the temporal relationship was not."

The trial court's omission does not warrant reversal. First, there was no factual dispute at trial with respect to whether there was both a logical and temporal connection between the robbery and Tony's death. The unrebutted testimony showed Tony's death occurred after masked robbers forced their way into his apartment and he and his brother attempted to defend themselves. This is not an instance where there was or could have been a claim Tony's death was unrelated to the robbery or occurred at a different time or place. . . .

Where, as here, there is no dispute the victim's death occurred during the course of and as a result of the robbery, there is no requirement an instruction explicitly setting forth the requirement of a logical and temporal nexus be given. . . .[7]

(Lodg. 5, pp. 9-10, *quoting* Cavitt, 33 Cal. 4th at 203 (citations omitted) for the propositions: "The existence of a logical nexus between the felony and the murder in the felony-murder context, like the relationship between the robbery and the murder in the context of the felony murder special circumstance, is not a separate element of the charged crime but, rather, a clarification of the scope of an element;" and " '[t]he mere act of "clarifying" the scope of an element of a crime or special circumstance does not create a new and separate element of that crime or special circumstance.' ")

The Court of Appeal found no material error occurred in the context of the entire instructional charge. (Lodg. 5, p. 11.) The court highlighted three other CALCRIM instructions Albarran's jury received that bear on the showings necessary "under the felony-murder theory of murder and as a special circumstance that the killing and the robbery were part of one continuous transaction." (Id., p. 12.) "In light of the other instructions," and from the verdict form returned by the jury, "it is simply not reasonable to conclude the jury was left with any erroneous impression as to what was required to find the felony murder special circumstance true."[8] (Id., p. 13.) The state court reached its result

[7] The Court of Appeal continued: "Although neither the prosecution nor the defense objected to the shortened version of CALCRIM No. 730 which the court gave both orally and in writing, appellant contends the trial court was required sua sponte to more fully instruct the jury about the connection that must exist between the robbery and the killing. As *Cavitt* illustrates, appellant is mistaken. Because there was no factual dispute as to whether Tony was killed during the commission of the robbery, the trial court was not required to give *any* instruction on the issue and hence its provision of an instruction which appellant contends was unintelligible did not materially affect the trial." (Lodg. 5, p. 11.)

[8] "[T]he verdict form returned by the jury stated: 'And we further find the FIRST SPECIAL CIRCUMSTANCE that the murder of [Tony] was committed by defendant ODILON ALBARRAN, *while the said defendant was engaged in the commission and attempted commission of the crime of Robbery*, in violation of Penal Code section 211, within the meaning of Penal Code section 190.2(a)(17), to be: TRUE.' (Italics

by applying the appropriate legal standard and making objectively reasonable factual findings supported by the record, foreclosing federal habeas relief on this issue. <u>Estelle</u>, 502 U.S. at 72-73; 28 U.S.C. § 2254(d).  It is recommended relief on Ground Five be **<u>DENIED</u>**.

### 4. <u>Ground Eleven</u>

Albarran alleges as Ground Eleven the trial court's giving of a modified version of the CALCRIM No. 252 instruction on the specific intent required for the commission of murder and robbery was reversible error.  (Dkt No. 1-2, pp. 23-29.)  The Court of Appeal addressed and rejected this claim on the merits, reproducing in its opinion the pertinent portions of the instruction, italicizing the added sentence Albarran contends is prejudicially erroneous:

> Without objection the trial court gave a version of CALCRIM No. 252 which stated, in pertinent part:  "Every crime or other allegation charged in this case requires proof of the union, or joint operation, of act and wrongful intent.  [¶]  "The following crimes and allegations require a specific intent or mental state:  Premeditated Murder, Second Degree Murder & Robbery for Felony Murder, 1st degree.  To be guilty of these offenses, a person must not only commit the prohibited act, but must do so intentionally or  on purpose.  *It is not required, however, that the person intend to break the law.*  The act and the intent or mental state required are explained in the instruction for each crime or special circumstance."  (Italics added.)  The italicized sentence is not in the official version of the CALCRIM No. 252.

(Lodg. 5, p. 14.)

"The trial court then went on to instruct the jury fully on the mental states required for commission of premeditated murder, second degree murder, robbery and felony murder."  (Lodg. 5, p. 14.)  In addition, the record reveals the trial court also addressed the jury before closing arguments, to "correct" and clarify that instruction.

> The D.A. has to prove beyond a reasonable doubt the identity of the person they have charged.  Then, when you get to the substantive charges, two things you will be considering:  murder, set [out] as first or second degree, and then the additional allegations.  And you may recall that I stated that each of the things must be proved beyond a reasonable doubt.
>
> And then the instruction about the order in which you consider things and how the verdicts are returned.  When we discussed the topic yesterday of specific intent, I did omit one thing.  Let me reread part of Instruction Number 252.

added.)"  (Lodg. 5, p. 13.)

11cv0019

Every crime or other allegation in this case requires proof of union or joint operation of act and wrongful intent. The following crimes and allegation require a specific intent or mental state. Yesterday, I told you premeditated murder, first degree, or second degree murder. I forgot to mention the alternative theory.

The District Attorney is proposing as a theory willful premeditated murder as first degree or felony murder, which would be in the first degree. In order to have the felony murder, you must be satisfied beyond a reasonable doubt that the defendant is guilty of robbery, and we gave you that instruction for robbery.

So the correction is the following crime and allegations require a specific independent or mental state. Premeditated murder in the first degree, felony murder, which is murder during the commission of robbery, or second degree murder. To be guilty of those offenses, the person must not only commit the prohibited act, but must do so intentionally or on purpose.

It is not required, however, that a person intend to break the law. The act and the intent or mental state required or explained in the instruction elsewhere for each of the crimes or for the special circumstance, which is murder during the commission of a robbery [*sic*].

(Lodg. 14, RT Vol. 13, pp. 1257-1259.)

The Court of Appeal found "the trial court's instruction was an accurate statement of the law. . . ." (Lodg.5, p. 15.) That conclusion is binding on federal habeas courts. <u>Bradshaw</u>, 546 U.S. at 76. The court also found "appellant neither objected nor suggested any amplifying or clarifying instruction," and thereby waived any objection. (<u>Id.</u>) Even if Albarran had preserved an objection, the court determined "it would have been without merit" because, in consideration of the entire jury charge, the specific intent instructions "fully and unambiguously advised the jury as to the mental state required to find appellant guilty of murder and robbery, and thus instructing the jury that it need not find defendant intended to break the law would not have misled or confused the jury." (<u>Id.</u>, p. 16.)

It is recommended the Court find the state court result was not contrary to nor an unreasonable application of United States Supreme Court precedent, nor does it reflect an objectively unreasonable determination of the facts from the evidentiary record. 28 U.S.C. § 2254(d). The Court should **<u>DENY</u>** habeas relief on Ground Eleven.

### F.   <u>Ground Six:  Prosecutorial Misconduct Through Vouching</u>

Ground Six alleges prosecutorial misconduct through improper vouching for witnesses. (Dkt

No. 1-1, pp. 49-59.)  "Vouching consists of placing the prestige of the government behind a witness

through personal assurances of the witness's veracity, or suggesting that information not presented to

the jury supports the witness's testimony."  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.

1993).  Albarran alleges that during questioning and closing argument, the prosecutor "impliedly –

if not expressly – suggest[ed] these witnesses were truthful because of their positions as law

enforcement officers."  (Dkt No. 1-1, p. 49 (typography altered); *see* Dkt No. 23, pp. 43-51.) In

affirming the judgment, the Court of Appeal characterized Albarran's contention "that in his

questioning of the investigator and in his rebuttal argument, the prosecutor improperly vouched for

the credibility of the members of law enforcement who testified at trial" as a "misper[ception] of

improper vouching." (Lodg. 5, p. 18.)  From the trial record, the court found no coaching or vouching

misconduct.

> In cross-examining Miguel, appellant's counsel strongly suggested the prosecutor, while interviewing Miguel before his preliminary hearing testimony, told Miguel to identify appellant as the robber who stabbed Tony to death after Miguel tore his mask off.  In response to the suggestion Miguel was coached to identify appellant, the prosecution presented testimony from a police detective and an investigator from the district attorney's office who were present during the interview.  The detective and the investigator stated Miguel was never told to identify appellant but instead was repeatedly told to tell the truth.  At one point the prosecutor asked the investigator if the investigator would ever permit such coaching of a witness to take place.  The investigator stated he would not permit a witness to be coached.

> During closing argument, appellant's attorney asserted appellant was innocent, the investigation started on a false premise which the investigator and the prosecutor were unwilling to abandon and the investigator told Miguel, " 'You gotta come and identify Mr. Albarran.' " Appellant's counsel also attacked Miguel's credibility and the credibility of the other prosecution witnesses. In particular, counsel stated: "[W]hat Detective Duran and Detective Baker have done in this case is wrong."

> In his rebuttal argument, the prosecutor made the following statement:  "Sometimes we hear bad things about our society. Sometimes, especially lately in the news, there are slams against our culture or the way we are.  From the time this country was founded, people who worked in law enforcement didn't care who was murdered. To them, a murder was a murder.  Sheriffs and marshals in this part of the country, when it was still being settled, they would go to the ends of the earth to find a murderer.  They didn't care who the person was, who was murdered, or who the witnesses were.  Well, these detectives and cops they have slammed so much did exactly that.  [¶] . . . [¶]

> "They didn't care that Tony Ayala was a drug dealer.  They didn't care that the witnesses in this case would cause the accusations you have heard in this courtroom.  They didn't care that these witnesses would put you through more than anybody ever should have to go through.  They only cared -- these good people they insulted, they only cared about bringing a murderer to justice."

(Lodg. 5, pp. 16-18.)

The Court of Appeal concluded:  "In essentially asserting the investigators were dedicated public servants attempting to achieve justice, the prosecutor did nothing improper:  he did not refer to anything that was outside the record or the common knowledge of the jurors, and he did not attempt to relieve the jurors of their duty to judge the credibility of the witnesses."  (Lodg. 5, p. 20.)  The limitations on what a prosecutor may argue "do not preclude all comments regarding a witness's credibility," and vigorous argument is permitted "as long as it amounts to fair comment on the evidence," including "reasonable inferences, or deductions to be drawn therefrom" based on the facts of record "rather than any personal knowledge or belief."  (Id., pp. 18-19, *quoting* People v. Bonilla, 41 Cal.4th 313, 336-37 (2007).)  "Where, as here a prosecutor has not suggested to the jury that he is aware of evidence outside the record which bolsters a witness's credibility, no misconduct has occurred."  (Id, p. 18.)

Contextual factors are material to a determination whether a prosecutor's comments rendered a trial constitutionally unfair.  Courts consider:  "whether the comment misstated the evidence, whether the judge admonished the jury to disregard the comment, whether the comment was invited by defense counsel in its summation, whether defense counsel had an adequate opportunity to rebut the comment, the prominence of the comment in the context of the entire trial and the weight of the evidence."  Hein v. Sullivan, 601 F.3d 897, 912-13 (9th Cir. 2010) (citation omitted).  In addition, a "reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo" in assessing a vouching challenge.  United States v. Young, 470 U.S. 1, 12 (1985).  "[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."  Id. at 12-13 (1985).  As summarized by the Court of Appeal in this case:

> [T]here is no dispute appellant's counsel forcefully impugned the integrity of the investigators and the prosecution's witnesses and in his

1
2
3
4
5
6
7
8

> questioning of the investigators the prosecutor did nothing more than give them a chance to directly refute the implication of defense counsel's questions.  In doing so the prosecutor in no sense went outside the record or suggested the jury not determine the credibility of the investigators.  When defense counsel again impugned the integrity of the investigators in his closing argument, in his rebuttal the prosecutor reminded the jurors that in fact the integrity of the prosecutors had been impugned.  In addition to pointing out the insulting nature of counsel's argument, in the major thrust of his argument the prosecutor defended the officers by alluding to another undisputed fact:  neither the victim nor the percipient witnesses led exemplary lives.  From this fact the prosecutor asked the jury to conclude that rather than engaging in an unfair prosecution of appellant, the prosecutors were instead simply attempting to obtain justice for Miguel, notwithstanding Miguel's criminal lifestyle and the criminal lifestyle of his brother and wife.

9

(Lodg. 5, p. 20; *see* Lodg. 14, RT Vol. 13, 1340:7-1341:5.)

10
11
12
13
14

Albarran's jury received the instruction that arguments of counsel are not evidence that may be consider in reaching a verdict.  (Lodg. 14, RT Vol. 12, 1227:6-14.)  He fails to demonstrate that the state court's factual determinations on this issue are objectively unreasonable.  It is recommended habeas relief on Ground Six be **DENIED**.

15

> ### G.   Ground Seven:  Improper Reference To Past Crime

16
17
18
19
20

Albarran alleges as Ground Seven prosecutorial misconduct when a prosecution witness "referenced appellant's past criminal conviction and imprisonment" and seeks relief from the trial court's failure to grant a mistrial on that basis.  (Dkt No. 1-1, pp. 60-65, Dkt No. 1-2, pp. 1-7.)  The claim arises from Lieutenant Duran's testimony describing the CODIS system DNA database as "profiles of convicted felons" (Lodg. 14, RT Vol. 9, 838:9-12), an excluded remark Albarran contends was so prejudicial that it could not be mitigated by jury instructions.[9]

21
22
23

The Court of Appeal addressed the merits of this claim on direct review (Lodg. 5, pp. 21-26), stating the question presented as "whether the investigator's reference to felons in the CODIS system

24
25
26
27
28

---

[9]  Defense counsel immediately objected to that testimony.  At sidebar, counsel requested a mistrial. The trial court heard argument, criticized the witness, discussed the significance of that error, but was unwilling to go so far as to say he intentionally lost the tape, resolving to simply instruct the jury to disregard the question and the witness' answer.  (Lodg. 14, RT Vol. 9, pp. 838-844.)  Further discussion on the record among the court and counsel regarding the CODIS database source, that testimony, prior stipulations, and the mistrial motion continued the next day, including the defense request that the court *sua sponte* declare a mistrial both on that ground and on grounds of cumulative error purportedly resulting in a denial of due process predicated, among other things, on Miguel's "fear testimony" and the contention Carolina Chavez was not a credible witness. (Lodg. 14, Vol. 10, pp. 845-851.)

was so prejudicial that we must reverse [his] conviction" (Id., p. 22). The court acknowledged "the detective's reference to the DNA of convicted felons in the CODIS data base was improper."  (Id.) There had been a pre-trial agreement that prosecution witnesses would not make any reference to the origins of that data base, and "the trial court advised the parties their agreement would be treated as an in limine ruling excluding such references."  (Id.; see Lodg. 14, RT Vol. 1, 1:18-2:7.)  The court acknowledged the seriousness of the witness's forbidden description, but it deemed the impropriety to have been cured by the trial court's multiple admonitions to the jury.  (Id., pp. 21-22.)

> In support of its case, the prosecution called a police detective to testify about, among other matters, CODIS, a DNA data base operated by the California Department of Justice.  On direct examination, the detective said:  "Basically, it's a large database of D.N.A. profiles of convicted felons."  Appellant's counsel objected and asked for a sidebar.  Before excusing the jury and conducting the sidebar, the trial court instructed the jury to disregard the detective's remark.  At the sidebar, appellant's counsel moved for a mistrial. Before ruling on the mistrial, the trial court excused the jury for the day and gave the jury an additional instruction with respect to the detective's description of the CODIS data base:  "Folks, look, I mentioned that you have to disregard the previous comment.  I will order that you do disregard the previous comment.  Additionally, I have to state, as I had in the instruction and so forth, the jury decides the case only on the evidence presented.  And the only evidence presented in this case is that there is one person who has a criminal background, and that's [Carolina], okay?"

> After listening to further argument from counsel, the trial court denied the motion for a mistrial and counsel's alternative suggestion the court declare a mistrial on its own motion.  When the trial resumed, the trial court gave the jury another curative instruction.

(Lodg. 5, p. 21.)

The Court of Appeal acknowledged prosecutors' duty to instruct witnesses not to make statements that have been ruled inadmissible, and agreed with Albarran "that by indirectly suggesting appellant was a felon, the investigator's explanation of the CODIS system was a serious mistake" that in some factual contexts "might require a new trial." (Lodg. 5, pp. 22, 23.)  However in his case, the court found that "two sets of circumstances substantially mitigate the nature of any harm" and that the prejudicial effect of the impropriety was insufficient to require reversal.  (Id. p. 23.)

> First, the record is quite clear that at the time of the murder appellant was associating with criminals.  Indeed, at the time of the murder appellant was living with Aguirre and his 13-year-old girlfriend.  As we noted, Aguirre and his girlfriend moved in to appellant's apartment

1

2

3

4

5

6

7

8

> after leaving Tony's apartment and the drug business Tony was operating there. Given this evidence about appellant's lifestyle, the jury would not have been shocked or surprised to learn appellant himself had a criminal record. Second, the evidence of appellant's guilt was quite powerful. Although the eyewitnesses were confronted at trial with inconsistent statements they made shortly after the killing, the DNA evidence the prosecution presented, along with the undisputed fact that appellant never returned to his apartment after the killing, were convincing evidence of his guilt. In short, given appellant's lifestyle at the time of the killing and the other evidence of his guilt, this is not the sort of unusual situation in which we would question the jury's ability to follow the trial court's direction and consider only the properly admitted evidence. Thus the detective's inadvertent statement did not require a mistrial.

(Lodg. 5, p. 23.)

9

\\

10

11

12

13

14

15

16

17

18

Even assuming that testimony amounted to an unconstitutional trial error, to warrant federal habeas relief the error must have had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623. In consideration of the considerable unobjectionable evidence against Albarran summarized by the state courts and reproduced above, the Court should defer to the state court's objectively reasonable finding the effect of the witness' improper reference to the source of the DNA data base was not sufficiently "substantial and injurious" to warrant disturbing the result, particularly in light of the trial court's curative intervention. Accordingly, it is recommended habeas relief on Ground Seven be **DENIED**.

**H.      Ground Eight:  Improper Eliciting Of Testimony**

19

20

21

22

23

24

Albarran alleges prosecutorial misconduct by "eliciting testimony from the prosecutor's star witness that he was afraid to testify." (Dkt No. 1-2, pp. 8-12.) This claim was rejected by the California courts (*see* Lodg. 5, pp. 24-26), and he "concedes" in his Traverse this "is not a federal claim for which relief may be granted" (Dkt No. 23, 3:15-18). It is recommended the Court construe his concession as an abandonment of the claim and **DENY** relief on Ground Eight.

**I.      Ground Nine:  Destruction Of Evidence**

25

26

27

28

Ground Nine alleges prosecutorial misconduct based on Lieutenant Duran's apparently inadvertent destruction of "a key piece of evidence" in the form of a videotaped Spanish language interview with Elizabeth Escogido conducted in 2004 and "fail[ure] to provide a transcribed

translation of that interview to the defense." (Dkt No. 1-2, pp. 13-18; Dkt No. 23, 60:12-14.)  The record reflects investigator Baker conducted the Escogido interview with sergeant Duran, then head of the cold case homicide unit, acting as interpreter, and wrote a two and one-half page summary of the interview, a report that had been turned over to the defense during discovery. (Lodg. 14, RT Vol. 6, p. 519.).  Escogido's evidence could be construed as Albarran having confessed to the crime when he called her just a day or two after the 1991 murder.

During the jury selection process, when the parties thought the tape had only been misplaced rather than permanently lost, the trial court and counsel discussed the on-going efforts to locate the original recording of the Escogido interview.  Apparently several taped interviews had been forwarded from the police to the prosecution in January 2005, with the Escogido tape returned to police for a translation.  That tape had not resurfaced. (Lodg. 14, RT Vol. 6, pp. 425-432, 517-520.)  Defense counsel requested a sanction in the form of precluding Escogido from testifying at trial, arguing the prosecution had a duty both to preserve the tape and to produce it to defense counsel.  (Id., p. 520.) The prosecutor pointed out Escogido had testified at the preliminary hearing, where both sides had the opportunity to question her, and argued the requested sanction was improper in cases of loss or destruction of evidence through negligence.  The court discussed the state of the evidence and the Escogido testimony after hearing argument from both sides.  (Id., pp. 522-535.)  The court confirmed the Baker report was available to everyone at the preliminary hearing, no one currently had the tape, neither the District Attorney nor anyone from his office had ever viewed the tape, investigator Baker did not look at the tape after it was recorded, Sargent Duran took the tape back to do a transcription into English, and it had not been seen since. (Id., pp. 538-539.)  The court observed, "Everybody knows what this woman will testify to and how she is vulnerable to cross-examination," and counsel would be permitted to ask about her previous testimony.  (Id., 535:22-28, p. 537.)

The trial court held a formal evidentiary hearing on November 29, 2006, on the limited issues of how the tape came to be missing and the appropriate remedy, before denying the motion to exclude the Escogido testimony. (Lodg. 14, RT Vol. 7, 553:14-16.)  As summarized by the Court of Appeal:

Prior to trial, a police detective interviewed Elizabeth Escogido. The interview was conducted in Spanish and recorded on a videotape. At a pre-trial hearing the prosecutor disclosed the tape was lost.

1

2

3

4

5

6

7

8

9

Appellant moved that testimony from Escogido be excluded.  The trial court conducted an evidentiary hearing in which a paralegal from the district attorney's office and the police detective who conducted the interview testified. The paralegal testified that during the investigation he was given custody of the tape, along with five other tapes, and that he copied the five tapes.  The paralegal testified he did not copy the Escogido tape but instead returned it to the police detective so the detective could provide an English translation. According to the police detective, he could not locate the Escogido tape in his desk and believed he may have destroyed the tape when he left the homicide unit in 2005.  The detective explained that when moving he would have destroyed any tapes he found in his desk because he erroneously believed they had all been copied.  Following the evidentiary hearing, the trial court found the loss of the tape was inadvertent and denied the motion to exclude testimony from Escogido.  As we noted previously, Escogido testified at trial that shortly after Tony was killed appellant called her, asked her if she had heard about Tony's murder and told her Tony got smart with him over some money.

10

11

(Lodg. 5, p. 26; *see* Lodg. 14, RT Vol. 6, pp. 518, 535-537, Vol. 7, pp. 552-570.)

12

13

14

15

16

17

18

19

20

21

22

23

The issue and implications of the lost Escogido interview tape were also explored at trial during the examination of  Lieutenant Duran.  (Lodg. 14, RT Vol. 10, pp. 882- 885.)   The Court of Appeal, applying federal due process standards, rejected Albarran's claim he was deprived of a fair trial associated with the loss of the tape.  "A due process violation occurs when, acting in bad faith, the government fails to preserve evidence which possesses apparent exculpatory value and is of such a nature that the defendant is not likely to obtain comparable evidence by other reasonably available means." (Lodg. 5, p. 27, *citing, inter alia,* Arizona v. Youngblood, 488 U.S. 51, 58 (1988), California v. Trombetta, 467 U.S. 479, 489 (1984).   "[A] trial court's inquiry whether evidence was destroyed in good faith or bad faith is essentially factual:  therefore, the proper standard of review is substantial evidence."  (Id., *quoting* People v. Memro, 11 Cal.4th 786, 831 (1995).)  The Court of Appeal found the record fully supports "the trial court's conclusion the government acted in good faith and no due process violation occurred."  (Id..)

24

25

26

27

28

To obtain federal habeas relief on this ground, Albarran had to do more than disagree with the state courts' findings.  Escogido testified at his trial and was fully cross-examined, at which time her recollections, veracity, and credibility were tested by the defense and observed by the factfinders. (Lodg. 14, RT Vol. 11, pp. 1090-1100.)  Albarran does not suggest any factual basis for a reasonable inference the lost recording had exculpatory or even impeachment value.  "[U]nless a criminal

1  defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence

2  does not constitute a denial of due process of law."  Youngblood, 488 U.S. at 58.   He has made no

3  such showing.  Accordingly, federal habeas relief on Ground Nine should be **DENIED**.

4      **J.**      **Ground Ten:  Cumulative Effect Of Prosecutorial Misconduct**

5      Ground Ten alleges "the cumulative effect" of the "various incidents of prosecutorial

6  misconduct" requires reversal, "even if individually they do not." (Dkt No. 1-2, pp. 19-22.) "In some

7  cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal,

8  the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick,

9  78 F.3d 1370, 1381 (9th Cir. 1996).  The Court of Appeal rejected this claim:

> Finally, appellant contends that even if no single instance of
> what he believes was prosecutorial misconduct requires reversal, the
> cumulative impact of prosecutorial mistakes warrants reversal.  (See
> *People v. Hill* (1998) 17 Cal.4th 800, 844-848.)  The central problem
> we have with appellant's argument is, contrary to his contention on
> appeal, the prosecutor was not guilty of numerous instances of
> misconduct.  The only intrusion on appellant's rights which occurred
> was the detective's inadvertent reference to felons in the CODIS
> database, which we have determined did not cause undue prejudice.
> Thus, we reject appellant's contention the judgment should be reversed
> because of cumulative prejudice.

16  (Lodg. 5, pp. 27-28.)

17      As it is recommended this Court reach the same results as did the state courts on each of

18  Albarran's discrete prosecutorial misconduct claims, relief on Petition Ground Ten should be **DENIED**

19  on the same basis.

20      **K.**      **Grounds Twelve And Thirteen:  Insufficient Evidence**

21      Albarran alleges as Ground Twelve insufficient evidence supports a robbery felony-first degree

22  murder special circumstance finding (Dkt No. 1-2, pp. 30-36), and as Ground Thirteen insufficient

23  evidence of premeditation and deliberation supports the first degree murder conviction (Id., pp. 37-40).

24      "As a matter of federal constitutional law, 'the Due Process Clause protects the accused against

25  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

26  crime with which he is charged.' "  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), *quoting* In

27  re Winship, 397 U.S. 358, 364 (1970).  A constitutional challenge to the sufficiency of the evidence

28  is evaluated under the clearly established principles enunciated in Jackson v. Virginia, 443 U.S. 307,

11cv0019

318-19 (1979): "After <u>Winship</u>, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."   "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319 (citation omitted); *see* <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990) (a state prisoner is entitled to federal habeas relief for insufficiency of the evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt"), *quoting* <u>Jackson</u>, 443 U.S. at 324; <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995) (the <u>Jackson</u> standard "looks to whether there is sufficient evidence which, if credited, could support the conviction"; *see* <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).  California courts apply the federal standard in this context. <u>People v. Johnson</u>, 26 Cal.3d 557, 578 (1980), *citing* <u>Jackson</u>, 433 U.S. 307.  Federal habeas courts apply the standard "with an additional layer of deference" after AEDPA.  <u>Juan H.</u>, 408 F.3d at 1274.

As recently emphasized by the United States Supreme Court, in reversing a Ninth Circuit panel's conclusion that a state jury's verdict was irrational:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury -- not the court -- to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may only do so if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. --, [130 S.Ct. 1855, 1862 (2010)] (internal quotation marks omitted).

<u>Cavazos v. Smith</u>, 2011 WL5118826 at *1 (U.S. Oct. 31, 2011), *per curiam*.

A reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict." <u>Maass</u>, 45 F.3d at 1358; *see* <u>Schell v. Witek</u>, 218 F.3d 1017, 1023 (2000) ("[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively

1    appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and

2    must defer to that resolution' "), *quoting* Jackson, 443 U.S. at 326.

3         In denying the defense motion for acquittal at the end of the state's case in chief, the trial court

4    determined there was enough evidence for a reasonable jury to convict Albarran.

5           Ultimately, it will come down to a credibility call by the jury.  A lot of
            it is that, do they believe the mother and daughter and Miguel when
6           they say they now remember?  And, ultimately, it's a decision for the
            jury to make.

7    (Lodg. 14, RT Vol. 11, 1117:16-20.)

8         The Court of Appeal decision demonstrates sufficient evidence in the record supports the true

9    finding on the felony-murder allegation, contrary to Albarran's Ground Twelve contentions:

10          Tony was a drug dealer who kept money and drugs at his apartment.
            According to Miguel, on the evening of the murder, two men barged
11          into his brother's apartment, both men were wearing ski masks, one was
            brandishing a gun and one said, "This is a hold up."  Contrary to
12          appellant's argument, in order to establish a robbery the prosecution
            was not required to establish any more specific request for money on
13          the part of the robbers.  Moreover, this is not an instance . . . where the
            perpetrator plainly entered the victims' residence with an intent to kill
14          rather than rob the victims.  Instead, given the drugs and money Tony
            was known to keep in his apartment and the conduct of the invaders,
15          the jury could reasonably conclude the overall purpose of the invasion
            was robbery.
16

17   (Lodg. 5, pp. 28-29, distinguishing state caselaw Albarran relied on.)

18        That decision also demonstrates sufficient evidence in the record supports Albarran's first

19   degree murder conviction, contrary to his Ground Thirteen contentions.  After discussing categories

20   of evidence sufficient under state law to sustain a premeditated and deliberate murder conviction, the

21   court determined:

22               Here, the record shows that appellant appeared at a drug dealer's
            apartment with an accomplice armed and masked.  The record further
23          shows that during the struggle with Miguel, appellant went into the
            kitchen and found a knife, with which he then inflicted disabling
24          wounds on Miguel and deadly wounds on Tony.  Given these
            circumstances, the jury could reasonably have concluded appellant
25          went to the apartment fully prepared to kill Miguel and Tony and upon
            meeting resistance from the Ayala brothers, appellant quickly
26          determined that he would in fact kill the brothers to avoid detection or
            retaliation.  Although not a great deal of time elapsed, in light of the
27          evidence appellant was prepared for violence even before he entered
            the apartment, these circumstances were sufficient to support a finding
28          that during the course of the robbery appellant made a cold and

1                 calculated judgment that he had to kill both Miguel and Tony.

2 (Lodg. 5, pp. 29-30.)

3        A federal habeas court's role is solely to ensure that the state court's factual findings are

4 objectively reasonable and that the state court result comports with the clearly established

5 constitutional standards controlling the issue as articulated by the United States Supreme Court.

6 28 U.S.C. § 2254(d). A rational jury could easily reject the defense theory Albarran did not attack and

7 kill Tony Ayala because he was not in the apartment on September 16, 1991 if they credited and drew

8 reasonable inferences from the DNA evidence, the eyewitness testimony, the Escogido testimony

9 regarding what Albarran told her by phone within a day or two of the 1991 murder, Albarran's failure

10 ever to return to retrieve his possessions, and his untruthful statements regarding his connections to

11 San Diego and to persons involved in this incident when police first interviewed him, among other

12 evidence supporting the verdict. It is recommended habeas relief on Grounds Twelve and Thirteen

13 be **DENIED** because the evidence was substantial and sufficient to support his conviction, and the

14 result comports with controlling United States Supreme Court authority. 28 U.S.C. § 2254(d).

15         **L.**        **Ground Fourteen: Failure To Suppress Statements To Investigating Officers**

16        Ground Fourteen alleges Albarran's interview statements to investigating officers in December

17 2004, after he received allegedly defective <u>Miranda</u> warnings, should have been suppressed because

18 "the interpreter (Lieutenant Duran) was seriously inept in his communication" of those constitutional

19 rights, "resulting in a confusing, if not misleading advisement." (Dkt No. 1-2, pp. 41-49; Dkt No. 23,

20 69:26-70:2.) In seeking to suppress the statements, "[d]efense counsel argued that the supplemental

21 comments by Lieutenant Duran were discombobulated to the point of rendering the reading of

22 Petitioner's Miranda rights confusing, and, he further argued, Petitioner never voluntarily waived his

23 rights." (Dkt No. 23, 71:9-12, *citing* Lodg. 14, RT Vol. 11, 1020, 1045-1046.)

24        The trial court heard argument outside the presence of the jury on the defense motion to strike

25 those statements. A native Spanish-speaker certified interpreter testified to confirm the accuracy of

26 what officer Duran said to Albarran at the time, including both his preamble and the actual warning

27

28

as read from a card provided by the police department.[10]  The transcript of that proceeding and the trial

court's rationale for denying the motion appear at Lodgment 14, RT Vol. 11, pp. 1027-1049.  The

court denied the motion on grounds the challenged comments were only the preamble to the reading

of the actual <u>Miranda</u> rights, the rights themselves had been accurately conveyed and therefore no

<u>Miranda</u> violation occurred, and by continuing to speak with the investigators, Albarran waived those

rights. (Lodg. 14, RT Vol. 11, p. 1049.)  The statements he made after receiving the <u>Miranda</u> warning

were introduced at trial through Lieutenant Duran's testimony.  (<u>Id.</u>, pp. 1051-1057.)  The prosecution

proved the statements Albarran made were false.  The Court of Appeal rejected Albarran's arguments

he "was given a confusing <u>Miranda</u> warning in Spanish and the trial court should have excluded

statements he made to a police detective denying that he knew Tony, Escogido, any person named

Oscar, or that he ever lived in San Diego."[11]  (Lodg. 5, p. 30.)

> The trial court found the detective read the *Miranda* warning in Spanish from the form provided to the detective by the police department.  That warning fully satisfies the requirements of *Miranda v. Arizona* (1966) 384 U.S. 436.  Admittedly, before the detective actually gave the *Miranda* warning, the detective gave appellant a somewhat confusing explanation of what he was about to do.  The detective told appellant:  "After I read you your rights, if – you have a right that if I don't want to talk, I don't want to talk."  Like the trial court, we find this less than clear preamble to the *Miranda* warning which the detective gave did not render the actual warning appellant received ineffective in any respect.  As given, the warnings appellant

---

[10]  The English translation of Lieutenant Duran's preamble reads: "SD: Ody, Ody, what we are -- right now -- what we're going to do, we're going to explain to you what's going on, and also we are going to -- we want to ask you some questions. OA: Sure. SD: But since you have constitutional rights, we're going to read you your rights. OA: Okay. SD: After I read you your rights, if -- ah -- you have the right that if I don't want to talk, I don't want to talk.  If we give you -- give you a questions that you don't want to answer, that's your right, you don't have to answer. If there's something that yes -- that you want to tell me, you can say it.  Is that all (sic) right?  OA:  That's fine."  (Lodg. 1, CT pp. 11-12;  Lodg. 14, RT Vol. 11, pp. 1031, 1035-1036.)

[11]  Albarran contends he was prejudiced by the denial of his suppression motion because he "made a number of statements which the prosecution used at trial to demonstrate a consciousness of guilt, i.e., the fact Petitioner gave a number of false answers in this interview suggested he was covering up his role in the killing," such as:  "he wasn't in San Diego in September of 1991; he passed through San Diego only a couple of times; he stayed one time at the mission and another time at an elderly couple's house; he never loaned anybody clothing in San Diego, he did not know Oscar Aguirre, Elizabeth Escogido, or Oscar Duarte; he was at the Ocean View apartment; he never rode in a car in San Diego; he never lived in logan heights area of San Diego; and he never used force in San Diego."  (Dkt No. 23, 74:8-15, citing 11 RT 1022, 1052-1054.) This Court notes that before deliberations, the jury was presented with the parties' stipulation "that in September of 1991, Ody Albarran was living in San Diego.  During that time period, Mr. Albarran was staying in the apartment of Oscar Aguirre."  (Lodg. 14, RT Vol. 12, 1222:4-7.)  The court instructed the jury:  "The parties have entered into a stipulation, which is basically an agreed-to fact.  You take this as a fact.  It's something that doesn't need to be proved through witnesses or other evidence."  (<u>Id.</u>, RT Vol. 12, 1221:27-1222:2.)

1    received fully conveyed to appellant his rights as required by *Miranda*
     [and thus] the trial court did not err in admitting the statements
2    appellant thereafter made to the detective.

3    (Lodg. 5, pp. 30-31 (citation omitted).)

4         Albarran concedes:  "From all appearances, Lieutenant Duran accurately read the form

5    presenting the Miranda rights."  (Dkt No. 23, 70:21-22.)  Nor does not dispute "Lieutenant Duran

6    simply read the Spanish translation of the Miranda rights, asked Petitioner if he understood those

7    rights, and then proceeded to question him," and he "acknowledges that under normal circumstances

8    the fact Petitioner proceeded to answer questions put to him might indicate an implied waiver of his

9    rights."  (<u>Id.</u>, 72:7-12.)  "While it is true the actual Miranda rights that were ultimately read in

10   [S]panish were correctly conveyed," Albarran summarily argues "it certainly cannot be said Petitioner

11   would adequately (for constitutional purposes) have understood those rights, given how Lieutenant

12   Duran introduced those rights by way of a spontaneous preamble."  (<u>Id.</u>, 72:27-73:3.)  He contends

13   the trial court should have ruled the entire interview inadmissible and argues the "improper

14   introduction of Petitioner's admissions" at trial "contribut[ed] strongly to the verdict against him."

15   (<u>Id.</u>, 74:2-3.)

16        Albarran does not represent that he in fact did not understand his <u>Miranda</u> rights or that he

17   actually intended not to waive them.  He urges the Court to believe he placed more stock in a short,

18   ambiguous, conversational preamble than in the concededly accurate recitation thereafter of his

19   specific rights.  Duran's unscripted introduction did not conflict with any of the recited rights, and the

20   record reflects Albarran manifested no confusion at the time nor hesitation in subsequently answering

21   the officers' questions.  It is recommended the Court find that the state courts' result on this issue was

22   objectively reasonable and, according the required AEDPA deference to those findings, habeas relief

23   on Ground Fourteen should be **DENIED**.

24        **M.     Ground Fifteen:  Juror Misconduct**

25        Albarran alleges as Ground Fifteen "the judgment must be reversed due to misconduct by some

26   of the jurors" based on the discovery, after the  December 8, 2006 verdict and dismissal of the jury,

27   that "three pieces of evidence that went into the jury room did not come out again."  (Dkt No. 1-2, p.

28   50.)  He identifies those as:  "the court's exhibits No. 28 (a sixpack photographic lineup card shown

to Carolina Chavez), No. 39 (the transcript of the videotaped recording of prosecution witness Veronica Chavez), and No. 40 (a photographic line-up shown to Veronica Chavez.)" (Id.)  All three items were introduced at trial, and each was referenced when the court and counsel reviewed all the admitted exhibits prior to jury deliberations.  (See Lodg. 14, RT Vol. 11, pp. 1111-1113.)

When it was discovered on December 14, 2006 that the three exhibits were missing, defense counsel orally moved for an evidentiary hearing "to examine each of the jurors to see who took those exhibits and why." (Lodg. 1, CT 0258-0261.)  The court scheduled an evidentiary hearing on the issue of jury misconduct concerning the missing exhibits.  (Lodg. 14, RT Vol. 15,  pp. 1363-1368.)  The court heard argument after formal briefing, then reserved a ruling until the time of Albarran's April 20, 2007 sentencing.  (Lodg. 14, RT Vol. 16, pp. 1369-1377.)  The court heard additional argument at that time on the various grounds defense counsel raised, including the juror misconduct issue, before denying a new trial all for the reasons stated on the record.  (Lodg. 14, RT Vol. 17, pp. 1378-1396; Lodg. 1, CT 0354.)  In affirming the judgment, the Court of Appeal summarized:

> After the jury returned its verdict, the trial court discovered three trial exhibits were missing.  The exhibits, Nos. 38, 39 and 40, consisted of two photo lineups and a transcript of an interview of Tony's wife Veronica.[12]  The trial court's bailiff was prepared to testify the exhibits went into the deliberation room with the jury.  The bailiff was also prepared to testify that after the jury left, the deliberation room was a mess, "a lot of papers all over the place; a lot of papers in the trash."  In response to this information, appellant asked the trial court to question each juror with respect to the whereabouts of the missing exhibits or in the alternative release information with respect to the identity for the jurors so they might be questioned.  The trial court denied both requests and in addition treated the requests as a motion for a new trial, which it also denied.

(Lodg. 5, p. 31.)

Applying state law and an abuse of discretion standard of review, the Court of Appeal concluded "nothing in the record suggests the jury was guilty of any misconduct." (Lodg. 5, p. 31.)

> Given the circumstances which the bailiff discovered after the jury left the deliberation room, the trial court could reasonably conclude court personnel inadvertently disposed of the entirely documentary exhibits after the jury finished its deliberations.  This conclusion is buttressed by the fact that during the trial the jurors did not ask for the exhibits or otherwise indicate the exhibits were missing before the jury's deliberations were concluded.  As appellant concedes, if, as the record

---

[12]  The court probably meant Carolina, whose daughter is named Veronica.  (See Lodg. 5, p. 3.)

> suggests, the exhibits were not lost until after the verdict was returned, appellant was not prejudiced in any manner by the loss of the exhibits. Because the record fully supports the conclusion no jury misconduct occurred, the trial [court] did not abuse its discretion in denying the appellant's motion for an evidentiary hearing, for jury information or for a new trial.

(Lodg. 5, pp. 31-32.)

Albarran identifies here the "determinative question" as whether the "misconduct . . . in direct violation of the court's instructions" not to remove evidence from the jury room purportedly attributable to some of the jurors "tainted" the deliberation process to his prejudice, warranting a new trial.  (Dkt No. 23, 76:4-12.)   He "concede[s] that if the evidence was removed at the end of jury deliberations, no prejudice would have occurred to Petitioner's case."  (Id., 76:28-77:2.)

> If, however, the evidence was removed at the beginning of deliberations, then considerable prejudice could well have accrued.  If, for example, a juror took the evidence home, it is quite likely that juror might also have had some discussion with third parties concerning that particular evidence.  In addition, where a juror takes evidence with him or her for private inspection, he or she violates Penal Code section 1119 (the section pertaining to viewing evidence outside the courtroom).[13]   In such an instance, the juror is not viewing the evidence as a body under careful court supervision.

(Dkt No. 23, 77:2-10.)

The Sixth Amendment requires that a criminal defendant be tried by an impartial jury that reaches a verdict based on the evidence produced at trial.  Turner v. Louisiana, 379 U.S. 466, 471-72 (1965); see Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir. 2008).  The introduction of extraneous influences into jury deliberations constitutes misconduct which may result in the reversal of a conviction, if that trial error had a " 'substantial and injurious' effect or influence in determining the jury's verdict."  Estrada, 512 F.3d at 1235 (citation omitted).  Albarran's attempted showing of misconduct amounts to no more than speculation positing imagined scenarios.  He asks this Court to credit his musings as fact and to substitute them for the state courts' objectively reasonable findings. He offers no evidence that any juror actually removed an exhibit during deliberations, sought any outside information, or inserted any extraneous consideration into the deliberations.  See Brecht, 507

---

[13]   Albarran's speculation that CAL. PENAL CODE § 1119 could have been violated not only raises a purely state law issue not cognizable on federal habeas review, but also by its own terms, it applies only to procedures for jurors to view a place or personal property which cannot be brought into the courtroom.

43

1  U.S. at 638.  Relief on this purely hypothetical theory should be **DENIED**.

2  **III.       CONCLUSION AND RECOMMENDATION**

3        The Court submits this Report and Recommendation to United States District Judge Barry Ted

4  Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

5  for the Southern District of California.   For all the foregoing reasons, **IT IS HEREBY**

6  **RECOMMENDED** this habeas Petition be **DENIED** in its entirety on grounds the Petitioner is not

7  in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue

8  an Order:  (1) approving and adopting this Report and Recommendation, (2) entering an order

9  DISMISSING the petition without leave to amend; and (3) the court DECLINE to issue a certificate

10  of appealability.

11        **IT IS HEREBY ORDERED** no later than **February 23, 2012**, any party to this action may

12  file written objections with the Court and serve a copy on all parties.  The document should be

13  captioned "Objections to Report and Recommendation."

14        **IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and

15  served on all parties no later than **March 8, 2012**.  The parties are advised that failure to file

16  objections within the specified time may waive the right to raise those objections on appeal of the

17  Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d

18  1153, 1156 (9th Cir. 1991).

19        IT IS SO ORDERED.

20

21  DATED:  January 23, 2012

22                                      _Hon. Bernard G. Skomal_
23                                      Hon. Bernard G. Skomal
                                        U.S. Magistrate Judge
24                                      United States District Court

25

26

27

28

44                                                          11cv0019